UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MEDai INC.,

       Plaintiff,

vs.                                                       Case No. 6:12-cv-840-Orl-37GJK

QUANTROS, INC.,

       Defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

This cause is before the Court on the following:

1. Plaintiff's Motion and Memorandum of Law in Support of Application for Preliminary Injunction (Doc. No. 27), filed June 25, 2012;

2. Declarations of Swati Abbott, Steve Epstein, Clayton Ramsey, and Michael Tulloch, in Support of Motion for Preliminary Injunction (Doc. Nos. 28–31), filed June 25, 2012;

3. Plaintiff's Reply in Support of Its Motion for a Preliminary Injunction (Doc. No. 48), filed July 17, 2012;

4. Exhibit A attached to Plaintiff's Emergency Motion to Supplement Evidence in Support of Its Motion for a Preliminary Injunction & Incorporated Memorandum of Law in Support Thereof (Doc. No. 49), filed July 17, 2012;

5. Defendant Quantros, Inc.'s Opposition to Plaintiff MEDai, Inc.'s Application for Preliminary Injunction (Doc. No. 51), filed July 25, 2012; and

6. Declarations of Brian Baker, Greg Pautler, Thomas Leahy, Roop

1

Lakkaraju, Keith B. Hagen, and Chris Bethell (Doc. Nos. 52–57), filed July 25, 2012.

The parties appeared before the Court for oral argument on Plaintiff's Motion for Preliminary Injunction on July 31, 2012. (Doc. No. 58.) Upon consideration, the Court grants Plaintiff's Motion for the reasons set forth below.[1]

**BACKGROUND**

Plaintiff and Defendant license software to healthcare providers that allows those providers to meet various government-mandated reporting requirements. (Doc. No. 27, p. 2.) Plaintiff and Defendant entered into the Product Licensing Agreement[2] (Agreement) effective March 31, 2006, in which the parties agreed that Plaintiff would license Defendant's product and then sub-license that product to its own customers. (*Id.* at 3.)

Prior to the Agreement, Plaintiff used its own product to service its customers' reporting requirements needs. (*Id.* at 2–3.) The Agreement provided that Plaintiff would outsource this particular function to Defendant. (*Id.* at 3.) Plaintiff promised not to compete with Defendant's product during the term of the Agreement.[3] (*Id.*) In return, Defendant promised not to compete with Plaintiff's product for three years following

---

[1] The factual findings and conclusions of law of this Court in this Order are not controlling for any later purposes, including a permanent injunction or trial. *E. Remy Martin & Co. v. Shaw-Ross Int'l Imps.*, 756 F.2d 1525, 1528 n.1 (11th Cir. 1985).

[2] Portions of the Agreement will be quoted in as much detail only as necessary to dispose of this Motion, as the Agreement is under seal. (Doc. No. 33.)

[3] Section D.1.3 of the Agreement is entitled "Existing Products" and provides that "MEDai currently has, and intends to maintain, a product with features and functions comparable to the [Defendant's] Application (the 'MEDai Product'). Notwithstanding, MEDAi agrees that during the Term of this Agreement, it will not market or sell the MEDai Product." (Doc. No. S-1, p. 6.)

2

termination of the Agreement.[4] (*Id.*) The Agreement further provided that after its termination, Defendant would continue to provide service to Plaintiff's customers, "without further consideration,"[5] for the duration of the customers' sub-licenses that were granted prior to termination of the Agreement. (*Id.*) The parties also mutually agreed not to disclose or to use for their own benefit each other's confidential information,[6] defined by the Agreement as including, among other things, the identity of their customers[7] and the terms of the Agreement itself.[8] (*Id.* at 4.)

The Agreement terminated on March 31, 2012. (*Id.* at 3.) Plaintiff contends that, following termination, Defendant analyzed Plaintiff's confidential information to identify Plaintiff's most valuable customers and contact them in order to compete with Plaintiff for direct contracts with those customers. (*Id.* at 5–8.) Plaintiff alleges that Defendant sent a letter to at least one of those customers, Sharp HealthCare (Sharp), threatening to disrupt service if Sharp did not contract with Defendant directly. (*Id.* at 9.) Plaintiff

---

[4] Section D.5.1 of the Agreement provides that "Quantros agrees that it will not, . . . for three (3) years after the termination of this Agreement, provide any products competitive to the MEDai Product." (Doc. No. S-1, p. 9.)

[5] Section D.4.3 of the Agreement provides that the sub-license of Defendant's product "to any third-party, shall not be diminished or abridged by the termination of this Agreement and shall continue, without further consideration, for the duration of each Application license granted by MEDai to a third party prior to the effective date of the termination of this Agreement." (Doc. No. S-1, p. 8.)

[6] Section D.1.2 of the Agreement provides that "[d]uring and after the Term . . . of this Agreement, the Receiving Party will: . . . use the Confidential Information of the Disclosing Party only for the purposes of the Agreement and not otherwise for the benefit of the Receiving Party." (Doc. No. S-1, p. 6.)

[7] Section D.1.1 of the Agreement defines "confidential information" as including "proprietary information and trade secrets, . . . technical and non-technical business information, data, formulas, patterns, compilations, methodologies, programs, object and source codes, . . . financial data, research and development, future plans and the identity of actual or potential Clients or suppliers, . . . services and/or policies." (Doc. No. S-1, p. 5.)

[8] Section D.1.4 of the Agreement provides that "[t]he terms and conditions of this Agreement shall be treated as Confidential Information." (Doc. No. S-1, p. 6.)

claims that this conduct was part of a "scheme to steal" Plaintiff's customers. (*Id.* at 4.)

Plaintiff then brought this action in state court on May 23, 2012. (Doc. No. 2.) Defendant properly removed the case to this Court on June 4, 2012. (Doc. No. 1.) Plaintiff alleges Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, Tortious Interference with Contractual and Advantageous Business Relationships, Deceptive and Unfair Trade Practices, Conversion, violation of the Florida Uniform Trade Secrets Act, and Defamation. (Doc. No. 2.) Plaintiff now seeks a preliminary injunction. (Doc. No. 27.)

## STANDARD

The Court is authorized to enter a preliminary injunction by Federal Rule of Civil Procedure 65. To prevail on its request for injunctive relief, Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not issued; (3) that the threatened injury to Plaintiff outweighs the potential damage that the proposed injunction may cause Defendant; and (4) that the injunction, if issued, will not be adverse to the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1240 (11th Cir. 2005). The movant bears the burden of clearly establishing these requirements. *Id.*

However, the Court does not have to find that "evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Furthermore, the Court may consider "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Id.*

## DISCUSSION

For the reasons set forth below, the Court concludes that Plaintiff has carried its

burden and met the four requirements necessary for granting injunctive relief.

**I.      Substantial Likelihood of Success on the Merits**

The first factor in determining whether a preliminary injunction should issue is whether Plaintiff is likely to prevail on the merits of its claim. Without expressing an opinion as to whether Plaintiff will indeed ultimately prevail on the merits, the Court finds that Plaintiff has presently demonstrated a substantial likelihood of success on its breach of contract claim.[9]

To succeed on a breach of contract claim, Plaintiff must prove: (1) a valid contract exists, (2) the contract was materially breached, and (3) damages. *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). The parties do not dispute that a valid contract exists between them. Therefore, the claim turns on the elements of breach and damages.

**a.      Breach**

Plaintiff alleges that Defendant breached three provisions of the Agreement: (1) the noncompete provision, (2) the obligation to continue service, and (3) confidentiality. (Doc. No. 27, p. 4.)

**i.      Breach of Noncompete Provision**

Florida Statutes Section 542.335 provides that a party seeking to enforce a restrictive covenant, such as a noncompete provision, must prove that it is reasonably necessary to protect a "legitimate business interest," which includes, among other things, confidential business information and substantial relationships with customers.

---

[9] The Court finds that Plaintiff has shown a substantial likelihood of success on the merits of its breach of contract claim and that enjoining the breach of contract will sufficiently preserve the status quo. The Court makes no findings with regard to the likelihood of success of Plaintiff's other claims.

Fla. Stat. § 542.335(1)(b)(2)–(3). The parties do not dispute that the noncompete provision is valid, and the evidence shows that the provision was included in the Agreement as necessary to protect Plaintiff's customer relationships and proprietary information. (Doc. No. 28, ¶ 7; Doc. No. 29, ¶ 7.)

The issue, then, is whether Defendant breached the noncompete provision. Plaintiff argues that "[i]t is undisputed that Defendant Quantros is marketing its Application in competition with Plaintiff subsequent to termination of the Agreement in violation of Section D.5.1(ii)." (Doc. No. 27, p. 16.) Indeed, Defendant does not dispute that it is directly marketing its own product to Plaintiff's customers.[10] (Doc. No. 51, p. 11.) Rather, Defendant maintains that this contact was not in breach of the noncompete provision because the provision is only "triggered" when Plaintiff has a product of its own. (*Id.* at 9.) Plaintiff's product is defined by Section D.1.3 of the Agreement, entitled "Existing Products," as a product with "features and functions comparable to" Defendant's product.[11] (*Id.*) Defendant argues that Plaintiff "currently has no competitive product," so Defendant has not breached. (*Id.* at 7.)

On the present record, the Court finds that Plaintiff has sufficiently shown that it has a "product" as defined by the Agreement. Plaintiff maintains that it has a product. (Doc. No. 30, ¶ 8.) It admits that the product must be recertified and asserts that it is in the process of doing so, but it states that the product is operable. (*Id.*) The crux of Defendant's argument rests on the contention that Plaintiff's product must be current and ready to compete *now* with Defendant's product. (Doc. No. 51, p. 7.) The Court

---

[10] Defendant stated, "Quantros' direct contact with sub-licensees was permitted." (Doc. No. 51, p. 11.) Defendant's Chief Financial Officer, Mr. Roop Lakkaraju, also stated that "Quantros contacted three of MEDai's customers." (Doc. No. 55, ¶ 11.)

[11] *See supra* note 3.

6

does not presently read the Agreement this way. A plain reading of Sections D.1.3 and D.5.1 shows that in 2006, Plaintiff had an existing competitive product, and in 2012, Defendant is not allowed to compete with that product. Section D.5.1 does not set forth Plaintiff's product being recertified as a condition precedent to Defendant's noncompete obligation, nor does Section D.1.3 say anything defining Plaintiff's product as one which is continually recertified.[12] Therefore, the Court finds that, on the current record, Plaintiff has a "product" as defined by the Agreement and Defendant's noncompete obligation still stands.[13]

---

[12] *See supra* notes 3–4.

[13] Related to the issue of whether Plaintiff has a "product," the Court acknowledges the disagreement between the parties as to the meaning of the phrase "intends to maintain" in Section D.1.3 of the Agreement, which reads, "MEDai currently has, and intends to maintain, a product with features and functions comparable to [Defendant's] Application." (Doc. No. S-1, p. 6.) Plaintiff argues that the phrase "intends to maintain" means that but for the Agreement, Plaintiff *would have* continually recertified its product. (Doc. No. 28, ¶ 7; Doc. No. 29, ¶ 7.) Defendant argues that the phrase means that Plaintiff was *obligated* to continually recertify its product during the term of the Agreement so that on termination, the product would be immediately competitive in order to trigger Defendant's obligation. (Doc. No. 51, p. 16.)

The Court does not find that construction of this provision either way changes its reading that Plaintiff has a "product" as defined by the Agreement. However, if the Court were to find that this provision was ambiguous, recourse to extrinsic evidence to clarify such ambiguity would still come down in Plaintiff's favor.

The record evidence shows that the reason for the noncompete provision's inclusion in the Agreement was to allow Plaintiff "the time required either to update and re-certify its MEDai Product and migrate sub-licensee data to it, or to license a product from a third-party and migrate customer data to that product." (Doc. No. 28, ¶ 6; Doc. No. 29, ¶ 6.) This explanation answers a latent question in the contract—namely, why Plaintiff would continue to spend money continually recertifying its product for years while it was licensing a similar product from Defendant. This reasoning puts the "intends to maintain" language into context with the noncompete provision, integrating the two and supporting the conclusion that Plaintiff intended to do its product recertification *after* the Agreement terminated, during the noncompete period. This evidence casts serious doubt on Defendant's assertion that the noncompete provision is only effective when Plaintiff has a currently recertified and up-to-date product.

This explanation further integrates the purpose for the noncompete provision with another provision in the Agreement, Section B.3, which provides that if Defendant at

7

Further, Defendant argues that it did not breach the noncompete provision because it was "forced" to contact Plaintiff's customers to determine whether it had a continuing service obligation toward them. (Doc. No. 51, p. 11.) Indeed, Defendant claims that its letter to Sharp was a requested response to a telephone call between Defendant and Sharp and merely informed Sharp of the termination of the Agreement. (Doc. No. 51, p. 18; Doc. No. 52, ¶ 6.) This argument is not well-taken. As Plaintiff points out, the letter to Sharp "never mentions a license 'end date' or even asks Sharp when its sublicense with MEDai expired." (Doc. No. 27, p. 10.) The Court finds Defendant's assertion that the letter was a response to a verbal request difficult to credit in the absence of a reference to the phone call in the letter. Rather, the letter explicitly blames Plaintiff for the dispute and threatens to disrupt service if Sharp did not contract directly with Defendant. (Doc. No. 53-3, p. 2.) This evidence is, at this stage, enough to convince the Court that Defendant's actions were a breach of the noncompete provision. Plaintiff has therefore established that it is substantially likely to succeed on the merits of this part of its claim.

---

any time during the term of the Agreement failed to meet its governmental requirements, then "Quantros shall provide at least 150 days written notice to MEDai" and that would terminate the Agreement. (Doc. No. S-1, p. 2.) Plaintiff asserts that this 150-day period was built into the Agreement to allow Plaintiff time to recertify its product in the event that Defendant did not meet its obligations during the term of the Agreement. (Doc. No. 27, pp. 7–8 n.5.) Indeed, reading this provision together with the noncompete provision lends further credence to the conclusion that both parties contemplated a time period during which Plaintiff would recertify its product *following* the termination of the Agreement, rather than continually recertifying and updating it during the term of the Agreement.

This is the Court's initial reading of the "intends to maintain" language. However, the Court notes that it has made no finding as to whether that provision is indeed ambiguous and does not rely on that reading to come to the conclusion that Defendant's noncompete obligation is effective.

### ii.  Breach of Obligation to Continue Service

Plaintiff also alleges that Defendant has breached its obligation to continue to provide service to customers with sub-licenses entered into prior to termination of the Agreement, both by threatening to discontinue service to those customers and by demanding increased prices for service. (Doc. No. 27, p. 18.) The evidence shows that not only has Defendant threatened to discontinue service to certain of Plaintiff's most valuable customers, both by telephone and by mail, but also that some of Plaintiff's customers have experienced slower service from Defendant. (Doc. No. 30, ¶ 6.) Further, Defendant does not deny raising prices on existing sub-licenses. (Doc. No. 51, p. 10.)

Instead, Defendant argues that it "is not required to service MEDai's existing sub-licensees, including any renewals or extensions, post-term for the same consideration stated in the Agreement, or restrict Quantros from raising its prices after the expiration of the term." (*Id.*) This argument is flatly contradicted by the plain language of Section D.4.3 of the Agreement, which provides that Defendant's service to customers who had entered into their sub-licenses prior to termination of the Agreement shall continue "without further consideration, for the duration of each Application license."[14] (Doc. No. S-1, p. 8.) The record evidence at this time therefore demonstrates that Defendant has breached this obligation.

### iii.  Breach of Confidentiality

Finally, Plaintiff alleges that Defendant breached its obligation to keep

---

[14] Indeed, this Court reads Defendant's argument to be contradicted by its own evidence, as a letter from Defendant to Plaintiff stated that "[i]nvoicing" during the post-termination period for sub-licenses entered into prior to termination of the Agreement "would be based on the current terms." (Doc. No. 53-2, p. 2.)

confidential information private, by publicizing to customers the confidential terms of the Agreement itself and by using confidential data to identify for solicitation Plaintiff's most valuable customers. (Doc. No. 27, pp. 13–14.) In response, Defendant claims that it already knew the "identity of and contact information for most of MEDai's existing customers that Quantros would be servicing . . . because Quantros already knew and/or had existing business relationships with those customers." (Doc. No. 51, pp. 11–12.) Mr. Thomas Leahy, Defendant's former Executive Vice President for Sales, asserts that Defendant "knew most of the MEDai customers that [Defendant] would be servicing under the Agreement [so] we did not consider that information to be confidential." (Doc. No. 54, ¶ 6.) Mr. Roop Lakkaraju, Defendant's Chief Financial Officer, makes a similar assertion, stating that "MEDai clients are Quantros clients as well since Quantros supplies the service, maintains the portal, and includes first line level support to MEDai clients directly . . . . Therefore, information derived from the Quantros production channel related to hosting the application is not viewed by Quantros as confidential information as it relates to MEDai."

These assertions stand in direct contradiction to the plain language of Section D.1.1 of the Agreement, which defines the identity of customers as confidential. (Doc. No. S-1, p. 5.) That Section also excludes from the definition of "confidential information" any information received independently of the other party. (*Id.* at 6.) However, the fact that Defendant knew the identities of the customers it serviced under the Agreement does not bring the customer identities and related information within the exclusion, as that information was not received independently of Plaintiff. Thus, the Court presently finds that such information is confidential as defined by the Agreement.

Furthermore, even accepting for the purposes of argument the Defendant's contention that the *identities* of Plaintiff's customers are not confidential, the record evidence still shows that Defendant used confidential information to identify and target Plaintiff's most *valuable* customers. (Doc. No. 30, ¶ 12; Doc. 31, ¶ 11.) Thus, the Court finds that, on the current record, Plaintiff has sufficiently established the breach element.

### b.   Damages

Plaintiff has also sufficiently established damages from Defendant's alleged breaches of the Agreement. First, Plaintiff has shown that it has been and will be harmed due to Defendant's alleged breach of the noncompete provision, specifically Defendant's letter to Plaintiff's customer Sharp. Defendant sent Sharp a letter stating that Plaintiff had breached certain conditions of the Agreement and threatening to disrupt Sharp's service if Sharp did not contract directly with Defendant. (Doc. 53-3, p. 2.) Sharp terminated its contract with Plaintiff due to "MEDai's contractual difficulties with Quantros." (Doc. No. 49, p. 8.)

Defendant alleges that its letter to Sharp did not cause Sharp to terminate its contract with Plaintiff because Sharp had already decided to terminate its contract and use another vendor *before* Defendant made contact with Sharp. (Doc. No. 51, p. 18.) Defendant also maintains that its letter to Sharp was "responsive" to a request by Sharp confirming that the relationship between Plaintiff and Defendant had terminated. (*Id.*) Thus, Defendant argues, the termination of the contract is not damages flowing from any breach by Defendant. (*Id.* at 18–19.)

This argument is contradicted by the plain language of Sharp's letter to Plaintiff.

The record evidence shows that termination of Sharp's contract stems directly from Defendant's alleged breach of contract, as Sharp's letter states that the termination was caused by Plaintiff and Defendant's dispute. (Doc. No. 49, p. 8.) Furthermore, the letter goes on to praise Plaintiff's staff and notes that Sharp will continue to use Plaintiff's other products and services. (*Id.*) This suggests that the parties' dispute, rather than Sharp wanting to go to another vendor, was the real cause of Plaintiff's loss of that contract.

Plaintiff has also shown that it will suffer damages due to Defendant's alleged breach of its obligation to continue to provide service without further consideration. Defendant has demanded a price increase for continuing to service Plaintiff's pre-termination sub-licenses. (Doc. No. 30, ¶ 5.) Defendant does not deny that it has done so.[15] (Doc. No. 51, p. 10.) Any such price increase constitutes additional consideration not provided for in the Agreement and creates quantifiable damages. Thus, Plaintiff has successfully established all of the elements of a breach of contract claim and has clearly shown that it is substantially likely to succeed on the merits of that claim.

## II. Irreparable Injury

Violation of a valid restrictive covenant raises a presumption of irreparable injury. Fla. Stat. § 542.335(1)(j). As Plaintiff has demonstrated a substantial likelihood of success on the merits of its breach of noncompete claim, irreparable injury is presumed. Further, the fact that damages alone are inadequate in this instance and that equitable

---

[15] Defendant claims that "Quantros is not required to service MEDai's existing sub-licensees . . . post-term for the same consideration stated in the Agreement." (Doc. No. 51, p. 10.) In fact, Section D.4.3 of the Agreement states the very opposite. *See supra* note 5.

relief is necessary was contemplated by both parties and enshrined in the Agreement.[16] (Doc. No. 27, p. 22.)

Even beyond this presumption, Plaintiff has demonstrated actual irreparable harm here. Irreparable injury is present where the use of confidential information results in harm to goodwill and confusion to customers. *Ryan, LLC v. Evans*, No. 8:12-cv-289-T-30TBM, 2012 WL 1532492, at *9 (M.D. Fla. Mar. 20, 2012) (citing *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). Defendant's undisputed contact with Plaintiff's customers has created confusion and anxiety among those customers and threatens irreparable harm to Plaintiff's customer relationships and its reputation. (Doc. No. 30, ¶¶ 6, 10, 13.) Thus, Plaintiff has sufficiently established the irreparable injury element.

## III. Balance of Hardships

Plaintiff must prove that the injury it faces outweighs any harm that Defendant may face should the injunction issue. Plaintiff notes, and the point is well-taken, that "Defendant has represented to this Court that it has no intention of disrupting service to MEDai's customers . . . so it cannot argue that it is harmed by the entry of an order merely prohibiting it from doing what it says it has no intention of doing anyway."[17] (Doc.

---

[16] Section D.5.2 of the Agreement provides that if either party breached the noncompete provision, "the other Party will be entitled to seek injunctive or other equitable relief to restrain any breach or threatened breach . . . , it being agreed that money damages alone would be inadequate to compensate the other Party and would be an inadequate remedy for such breach." (Doc. No. S-1, p. 9.)

[17] Defendant alleges that "it is undisputed that Quantros has never disrupted or diminished service to any of MEDai's sub-licensees, nor does it intend to do so." (Doc. No. 51, p. 14.) This argument is utterly belied by the letter Defendant sent to Sharp stating that it would experience a "potential disruption of service . . . within the next five business days" and detailing Sharp's next steps should "a disruption of service take[] place." (Doc. No. 53-3, p. 2.)

No. 27, p. 23.) So long as Plaintiff upholds its end of the bargain by notifying Defendant when each sub-license entered into prior to termination of the Agreement expires,[18] Defendant will not be harmed by being bound to its negotiated contractual obligations.

The threatened harm to Plaintiff, however, appears to be more severe. Plaintiff has substantial relationships with its existing customers that it has served over the past six years and even before the Agreement began, relationships that have been jeopardized as a result of Defendant's actions. (Doc. No. 30, ¶ 6.) On the other hand, any relationships that Defendant has with those same customers for the competing product either have yet to develop or have developed only through Plaintiff's sub-licensing efforts and Defendant's interaction with those customers pursuant to those efforts.[19] Defendant claims that it will be harmed by being prevented from selling its other products to Plaintiff's customers.[20] (Doc. No. 51, p. 24.) However, the Court

---

[18] Presently, the Court construes the Agreement to require Defendant to maintain service to the customers whose sub-licenses were in effect at the time of termination of the Agreement. The Court does not currently read the Agreement to allow Plaintiff and the sub-licensees to unilaterally and continually renew the sub-licenses after the expiration of the Agreement.

[19] The evidence shows that upon entering into the Agreement, Defendant "immediately gained approximately 70 customers" who had been using Plaintiff's product. (Doc. No. 30, ¶ 4.)

[20] Defendant also argues that Plaintiff's Motion should be denied on the basis of Plaintiff's alleged unclean hands. (Doc. No. 51, p. 13.) The Court does not find this defense persuasive. A defendant asserting unclean hands as a defense must show that plaintiff did some wrong that is directly related to the claim it is asserting and that such wrongdoing personally injured the defendant. *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993). Defendant asserts that Plaintiff's alleged breach of contract in failing to disclose the end dates of its customers' sub-licenses constitutes a wrongdoing that should prevent Plaintiff from obtaining an injunction. (Doc. No. 51, p. 13.) Defendant also claims that it has been "personally injured by MEDai's binding of Quantros to servicing MEDai customers under endless renewals unknown to Quantros." (*Id.*)

However, there has been no showing that Plaintiff has renewed any sub-licenses past the termination of the Agreement without notifying Defendant, nor has the

concludes that the loss of existing revenue and hard-earned goodwill outweighs any potential loss of business that may be won on the open competitive market in the future. This logically tips the balance of hardships due to loss of those customers' business in Plaintiff's favor.

## IV.    Public Interest

Finally, Plaintiff must prove that granting the injunction would not be adverse to the public interest. The public has an interest in protecting and enforcing valid contracts. *Ryan*, 2012 WL 1532492, at *9. It is true, as Defendant asserts, that there is no public interest in "stifling free competition." (Doc. No. 51, p. 24.) But the failure to enforce a valid contract actually disserves the public interest in protecting fair competition, particularly with regard to a restrictive covenant. As Florida has recognized by the enactment of Florida Statutes Section 542.335, there is an especially strong public interest in protecting confidential information and enforcing restrictive covenants, as that promotes legitimate business interests. *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004).

---

Defendant pointed to any provisions in the Agreement indicating that the failure to disclose the end dates of the sub-licenses is even a breach of the contract. Plaintiff maintains that it has never, in the six-year course of dealing between the parties, disclosed the end dates of sub-licenses in advance; furthermore, Defendant has never before needed this information prior to the end dates and has made no showing to the contrary. (Doc. No. 27, p. 11; Doc. No. 30, ¶ 6.) Defendant has failed, on the current evidence, to prove up this defense. Thus, the Court finds, in its discretion, none of Plaintiff's conduct to be a wrongdoing so unconscionable or reprehensible as to deny Plaintiff equitable relief.

    Really, though, the Court reads this "unclean hands" defense to boil down to an anticipatory breach argument, couched in equitable terms. Defendant essentially argues that Plaintiff's alleged breach forced its own and relieved Defendant of its obligations. But to assert anticipatory breach as unclean hands is akin to trying to get a square peg to fit into a round hole. The Court declines to stretch a legal defense—one which has not yet even been sufficiently proven—to stymie an equitable remedy.

Here, it is undisputed that there is a valid contract and Plaintiff has shown that it is substantially likely to prevail on the merits of its breach of contract claim. Granting this injunction is not adverse to the public's interest in enforcing contracts and protecting confidential information. Therefore, Plaintiff has met its burden of clearly establishing all four elements necessary for a preliminary injunction to issue.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Plaintiff's Motion for Preliminary Injunction (Doc. No. 27) is **GRANTED**.

2. Effective August 24, 2012, Defendant is **RESTRAINED** and **ENJOINED**, pending further determination by this Court, from:

    a. Using "confidential information" as that term is defined in the Agreement—including business information, data, purchasing patterns, financial data, and customer identities—to identify, contact, and solicit Plaintiff's customers;

    b. Disclosing "confidential information" as that term is defined in the Agreement—including provisions of the Agreement itself—to Plaintiff's customers;

    c. Charging service fees in excess of the fees in place at the termination of the Agreement for those sub-licenses entered into prior to termination of the Agreement; and

    d. Disrupting, diminishing, abridging, terminating, or otherwise hindering service to Plaintiff's customers, or threatening to do so, for the duration of those sub-licenses entered into prior to termination of the

    Agreement.

3.  As an express condition of this preliminary injunction, Plaintiff is **DIRECTED** to notify Defendant as each of its sub-licenses expires. Plaintiff shall notify Defendant of an expiring sub-license and the identity of that sub-licensee no later than fifteen (15) days prior to the expiration of the sub-license. Plaintiff shall, by August 31, 2012, notify Defendant of any sub-licenses that have already expired in the time period between the termination date of the Agreement and the date of this Order, and any renewals or extensions made in that same time period. All such disclosures shall be made in writing and shall be directed to Defendant's designated trial counsel. Defendant may terminate service only as to those sub-licenses that have expired, been renewed, or been extended after the termination date of the Agreement.

4.  Plaintiff is further **DIRECTED** to provide to Magistrate Judge Gregory J. Kelly, no later than August 31, 2012, the expiration dates of its sub-licenses and the identities of the corresponding sub-licensees. Magistrate Judge Kelly shall maintain this information under seal and shall monitor the disclosures required under paragraph 3 of this Order. Plaintiff shall provide to Magistrate Judge Kelly copies of each of the written disclosures made to Defendant. If Plaintiff fails to do so, Magistrate Judge Kelly is directed to conduct an investigation into the circumstances surrounding such failure and make a recommendation to the Court as to its effect. Failure to provide timely and complete disclosures as required by this

>Order may result in the Court dissolving this preliminary injunction on its own motion.

5. Pursuant to Federal Rule of Civil Procedure 65(c), the effectiveness of this preliminary injunction is conditioned upon Plaintiff posting a good and sufficient bond, on or before August 24, 2012, with the sureties acceptable to the Court. The parties shall meet and confer regarding an appropriate bond on or before August 22, 2012, and shall notify the Court once they have done so. If the parties cannot agree on an appropriate bond amount, this Court will determine and set a reasonable bond.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 16, 2012.

_____
ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

Honorable Gregory J. Kelly